J-S03015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LUIS F. ORTIZ, | |
| Appellant | No. 1140 EDA 2017 |

Appeal from the Judgment of Sentence Entered March 1, 2017
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0003465-2016

BEFORE: BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED APRIL 13, 2018**

Appellant, Luis F. Ortiz, appeals from the judgment of sentence imposed after a jury convicted him of simple assault. We affirm.

The trial court thoroughly summarized the procedural history and factual background of this case as follows:

On February 28, 2017, a Jury Trial was held in the above-captioned matter on one charge of Simple Assault [(18 Pa.C.S. § 2701(a)(1))], graded as a Misdemeanor of the 2nd Degree. On March 1, 2017, the Jury rendered a Guilty verdict and … Appellant was sentenced to serve not less than one year nor more than two years at a State Correctional Institution. Following the Trial, the [c]ourt found… Appellant guilty of one count of Harassment [(18 Pa.C.S. § 2709(a)(1))], graded as a Summary and imposed a consecutive 90 day period of probation.

On March 9, 2017, … Appellant filed Post-Sentence Motions, including a Motion for a New Trial (Verdict is Against the Weight of the Evidence)…. On March 16, 2017, the [c]ourt denied the

_____

[*] Former Justice specially assigned to the Superior Court.

Post-Sentence Motion. On April 4, 2017, [Appellant] filed a Notice of Appeal. On May 1, 2017, … Appellant filed a Concise Statement of Matters Complained of on Appeal. In the Concise Statement, … Appellant argued again that [the] verdict rendered was against the weight of the evidence presented at trial, specifically highlighting "the serious inconsistencies in [Ms. Yocum's] testimony, the lack of credible proof of Appellant['s] assaulting [Ms. Yocum], and … Appellant's actions as a result of provocation."

…

## SUMMARY OF THE FACTS

On May 9, 2016, at approximately 3:30 p.m., Heather Yocum returned to her home at 4173 Roosevelt Street, Whitehall Township, Lehigh County, Pennsylvania[,] after work. At the time, Ms. Yocum lived at the residence with her two children and … Appellant…. Ms. Yocum and … Appellant were paramours for approximately nine years at the time of the incident. When Ms. Yocum arrived home, … Appellant was in the living room, playing on his cellular telephone. Ms. Yocum walked into her bedroom, the only bedroom in the residence, and noticed items out of place. Specifically, Ms. Yocum noticed a child's doll propped between her bed's headboard and the wall and that the bed sheets were in disarray. Ms. Yocum recalled that the doll was not there prior to her leaving for work and [she] believed that the doll had been placed between the headboard and the wall to stop the headboard from banging against the wall. Ms. Yocum believed that the placement of the doll and the unkempt bedsheets were indications that … Appellant was having an affair.

[] Appellant followed Ms. Yocum into the bedroom. When she attempted to remove the doll, a nightstand toppled onto Ms. Yocum and … Appellant's feet. [] Appellant became angry and the two started to argue. Ms. Yocum told … Appellant to leave the residence and headed to the closet to remove … Appellant's belongings. [] Appellant tried to stop her and hit Ms. Yocum on the right, rear side of her head with his knuckle. Ms. Yocum refused to stop removing his belongings from the closet.

The argument continued into the living room and Ms. Yocum repeatedly asked … Appellant to leave, which he refused to do. The two became involved in a physical altercation.

At some point, Ms. Yocum left the residence to retrieve her children from daycare. After approximately 40 minutes, Ms.

Yocum returned with her children to the residence. She had her children go into the bedroom and watch television. Ms. Yocum again directed … Appellant to leave the residence. He again refused.

Ms. Yocum and … Appellant continued to argue, which resulted in a physical altercation. Ms. Yocum attempted to disable the Internet cord to prevent … Appellant from getting online, but … Appellant was able to thwart her efforts. In the course of the struggle over the Internet cord, … Appellant kicked Ms. Yocum in the upper leg while wearing his Timberland boots. The two continued the fight into the living room area where they pushed each other. [] Appellant again kicked Ms. Yocum in the upper leg. At some point, Ms. Yocum reached down to pick something up from the floor and … Appellant took his hand, swinging upwards and hitting [Ms. Yocum] on the bridge of her nose with the palm of his hand. Ms. Yocum fell to the floor in pain.

Ms. Yocum went to the bathroom to check on the injury to her nose and noticed that it was already beginning to swell. [] Appellant appeared shocked at her injury but would not let Ms. Yocum leave to attend to the injury. The physical altercation stopped at that point. Ms. Yocum began to look for her cellular telephone but soon realized that … Appellant had disassembled it and had hid the pieces. Ms. Yocum took her laptop computer and went into her garage.

[] Appellant kept coming in and out of the garage to check on Ms. Yocum. She did not tell him she was using her laptop. Ms. Yocum was able to log on to her Facebook account and began to message her sister's account via Facebook Messenger. Ms. Yocum's niece, Sierra Lugo, was using Ms. Yocum's sister's account at the time. Ms. Yocum told Ms. Lugo that she needed help and that she thought her nose was broken and that she was hurt. Ms. Lugo inquired about Ms. Yocum's children and Ms. Yocum indicated that they were unharmed. Ms. Lugo ultimately contacted her grandmother, Ms. Yocum's mother, Bonnie Yocum.

When Bonnie Yocum received a call from Sierra Lugo, she was able to discern that Ms. Lugo was upset. Ms. Lugo related that Heather Yocum was in trouble and was hurt badly. Bonnie Yocum called Heather Yocum, but Ms. Yocum did not answer the telephone. Because Bonnie Yocum is disabled, she called 9-1-1 to respond to 4173 Roosevelt Street and then decided to go to the

residence herself. When she arrived, she was directed by police to move out of the immediate area, which she did.

The Lehigh County Communications Center received the 9-1-1 call. Due to the fact that members of the Whitehall Township Police Department were busy on other calls at the other end of the township, Corporal Kevin Querio of the Whitehall Township Police Department requested that members of the Northampton Police Department assist them in responding to 4173 Roosevelt Street to check on the welfare of the occupants.

At this time, inside of 4173 Roosevelt Street, … Appellant came to the garage where Ms. Yocum was and informed her that the police were at the residence. Ms. Yocum could hear the police outside and heard … Appellant tell them that everything was fine in the residence. The police requested that they actually view Ms. Yocum and indicated that they would not leave until they were able to do so. Ms. Yocum heard … Appellant['s] arguing with the police, telling them that they did not have any right to be at the residence.

Approximately 15 minutes after the initial dispatch to 4173 Roosevelt Street, further police communication requested that Corporal Querio respond to 4173 Roosevelt Street immediately.

Upon arrival[,] Corporal Querio was informed that the Northampton officers had attempted to make contact with the individuals in the residence but the male individual on the other side of the door refused to open the door to allow officers to check on the welfare of those inside. Corporal Querio then knocked on the door of 4173 Roosevelt Street and began to speak to a male on the other side of the door. Corporal Querio advised the male that the police were there to check on the welfare of the individuals inside of the home. The corporal was able to hear a female['s] crying, but the male still refused to open the door. When Corporal Querio attempted to speak to the female, the male would interrupt, telling the officer that she was able to leave whenever she wanted to. The male continued to state that he knew his rights and that the female could leave whenever she wanted to. At one point, … Appellant opened the front blinds for a moment, but Corporal Querio was unable to determine if the female inside was alright.

Unknown to the police, … Appellant had moved furniture in front of the front door and the rear exit of the residence. Although he

- 4 -

wanted her to help move the furniture, Ms. Yocum refused to do so. [] Appellant also attempted to hide in the attic crawl space.

After approximately 15 to 20 minutes of trying to get the male to open the door, Corporal Querio determined he needed to summon additional law enforcement officers due to the exigency of the situation and his inability to establish that the occupants of the house were unharmed. After he had been on scene for approximately one hour, the corporal directed two other Whitehall Township officers to get a warrant for the home. In addition, Corporal Querio requested that the Municipal Emergency Response Team (hereinafter "MERT") be assembled and that Detective Timothy Wagner, a negotiator with MERT, be called.

MERT was assembled and a secure perimeter was established around the neighborhood surrounding 4173 Roosevelt Street. Detective Wagner eventually spoke to … Appellant who requested that the police leave. Detective Wagner told … Appellant that they could not do that until they saw both … Appellant and the female inside. In total, Detective Wagner spoke with both … Appellant and Ms. Yocum for approximately 30 minutes. At times, [Ms. Yocum] asked for the police to leave and also hung up on Detective Wagner.

As MERT was positioning, and while Detective Wagner was speaking with Ms. Yocum on the telephone, … Appellant emerged from the residence. He was searched, handcuffed, and detained at the scene. Ms. Yocum did not exit the residence. Corporal Querio and Detective Wagner went into the residence and found her cowered in a corner, hysterically crying. The officers noticed that furniture had been moved to barricade the exits in the front and rear of the residence. The officers observed facial injuries to Ms. Yocum and she was taken to the hospital.

Ms. Yocum went to Lehigh Valley Hospital for treatment. Approximately two days later, photographs were taken of injuries to her face, right leg, upper left thigh, left arm and ribcage. Ms. Yocum testified that she was unable to cover up the injuries to her face with makeup and that it took a few weeks for all of the bruising and scabbing to fully heal.

On May 10, 2016, Ms. Yocum went to the Whitehall Township Police Department to give her statement of what occurred the previous evening. The jury was shown an audio and video recording of the interview. Ms. Yocum testified that she downplayed the incident when she gave the statement to the

police because she was concerned that if … Appellant found out that she went to the police, he would retaliate in some way.

Trial Court Opinion (TCO), 5/31/2017, at 2-8 (internal citation and original brackets omitted).

On appeal, Appellant raises a single issue for our review:

Was the verdict against the weight of all the evidence in regards to the proof of whether or not [Appellant] was properly convicted of simple assault when the testimony implicating [Appellant] was inconsistent or contradictory?

Appellant's Brief at 7 (unnecessary capitalization omitted).

Initially, we set forth our standard of review:

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict…. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court.

A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion….

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

**Commonwealth v. Brown**, 48 A.3d 426, 432 (Pa. Super. 2012) (citation omitted).

Appellant argues that "he was unjustly and unfairly convicted of assaulting his former girlfriend when the evidence presented by her was contradictory and conflicting and would have provided for the verdict to be

based on conjecture rather than credible evidence." Appellant's Brief at 10. Specifically, Appellant claims that Ms. Yocum had previously given "statements to the police that [Appellant] did not punch her and other statements which implicated her as the possible aggressor in any physical confrontation between the parties." *Id.* at 11. Consequently, he contends that "[t]he questionable veracity and reliability of [Ms. Yocum] undermines the verdict and the decision of the [t]rial [c]ourt to sustain that verdict." *Id.* at 9.

After closely reviewing the transcripts and exhibits admitted at trial — including the video offered by the defense of Ms. Yocum's interview given to the police the day after the incident where she stated that Appellant did not mean to purposely hit her nose with his open hand — we reject Appellant's weight claim. As the trial court aptly explained:

> Viewing the evidence presented at trial, this [c]ourt has determined that the jury's verdict was not so contrary to the evidence presented at trial that a new trial is necessary. The jury was free to evaluate the evidence presented by the Commonwealth and give what importance it wished to each fact and/or testimony presented. While [Appellant] argues that there were "serious inconsistencies" and a "lack of credible proof," it is clear that the jury either did not find any inconsistencies in the testimony of the various witnesses and/or the different statements made by Heather Yocum or did not find that the inconsistencies were significant enough for the members of the jury to discredit the testimony.[1] Further, Ms. Yocum's testimony

---

[1] Ms. Yocum testified that she "downplayed" the incident in her police interview because she "didn't want to convict [Appellant]," and be the reason why he has to spend time in jail. *See* N.T. Trial, 2/28/2017, at 102-03. We

regarding the sequence of events and … Appellant's actions were supported by the testimony of Ms. Lugo, as well as the Facebook messenger messages shown to the jury at the time of trial.[2]  In addition, Ms. Yocum's testimony regarding her injuries was bolstered by the testimony of Corporal Querio and Detective Wagner when they testified that they observed visible injuries on [Ms. Yocum] when they saw her immediately after the incident.[3]  In sum, the verdict rendered by the jury does not "shock one's sense of justice" and therefore, the [c]ourt refused to disturb the verdict rendered in this case.

TCO at 9-10.  We agree.  Accordingly, we conclude that the verdict was not against the weight of the evidence, and affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

---

acknowledge that she testified at trial that Appellant hit her multiple times, *see id.* at 62-63, 65, kicked her in her leg, *see id.* at 65, and hit her on the bridge of her nose with the palm of his hand, *id.* at 66.  After she was hit in the nose and her face was starting to bruise, Ms. Yocum testified that Appellant's reaction "was, like, oh, my God.  Like, you could tell he was shocked.  Like, shit, like, you can't hide that.  There's no hiding it." *Id.* at 66-67.

[2] In the Facebook messages, Ms. Yocum said she was trapped and needed help, and that she thought her nose was broken.  *See* Commonwealth's Exhibit 1.  She also explained that she did not want to get anyone involved, but did not know what to do. *Id.*

[3] Corporal Querio specifically testified that "[w]hile observing [Ms. Yocum after she exited the house], she appeared to have some injuries on her face.  Her nose appeared to be slightly canted, as if it was struck.  She appeared to have bruising under her one eye.  She appeared to have a fresh lump on the side of the other eye."  N.T. Trial, 2/28/2017, at 119-20.  Similarly, Detective Wagner stated that he "saw that [Ms. Yocum] had injuries to her nose, to her eye, [and] to her face" when she came out of the house. N.T. Trial, 3/1/2017, at 20-21.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/18